CJ-2021-1555
Ogden



**IN THE DISTRICT COURT OF OKLAHOMA COUNTY**
**STATE OF OKLAHOMA**

| | |
|---|---|
| DEZSÖ SILAGYI AND MELISSA SILAGYI, as Co-Administrators of The Estate of N.S, deceased,<br>       Plaintiffs,<br><br>v.<br><br>INDEPENDENT SCHOOL DISTRICT NO. 12, OKLAHOMA COUNTY, OKLAHOMA, a/k/a EDMOND PUBLIC SCHOOLS; KENDALL ALLEN; BOARD OF EDUCATION OF EDMOND PUBLIC SCHOOLS,<br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

APR -9 2021

Case No.

CJ-2021-1555

## PETITION

Dezsö Silagyi and Melissa Silagyi, as Co-Administrators of The Estate of N.S, deceased, ("Plaintiffs", or "Mr. and Mrs. Silagyi") bring these claims against Defendants Independent School District No. 12, Oklahoma County, Oklahoma, a/k/a Edmond Public Schools (hereinafter "Edmond Public Schools"); Kendall Allen (hereinafter "Ms. Allen"); and Board of Education of Edmond Public Schools ("Board of Education") and state and allege as follows:

### Parties and Jurisdiction

1. Melissa Silagyi is the natural mother of N.S., and Dezsö Silagyi is the natural father of N.S., a minor who died by suicide on November 21, 2019 in Edmond, Oklahoma.

2. N.S. was a minor, fifteen years old, at the time of his death and a freshman at Edmond North High School.

3. Mr. and Mrs. Silagyi reside in Oklahoma County, Oklahoma and are citizens of the state of Oklahoma.

4. Kendall Allen was employed as a teacher at Edmond North High School in the fall of

Exhibit No. 1

2019. In this capacity, she was an employee or agent of Edmond Public Schools.

5. Upon information and belief, Ms. Allen resides in Oklahoma County, Oklahoma, and is a citizen of the state of Oklahoma.

6. Independent School District No. 12 a/k/a Edmond Public Schools was, and is, a public school district operating in Oklahoma County, Oklahoma. Upon information and belief, it is the third largest public school district in Oklahoma. Approximately 25,600 students were enrolled in Edmond Public Schools in the 2019-2020 school year.

7. Edmond North High School was, and is, operated as a high school within the Edmond Public School District. Upon information and belief, 2,504 students were enrolled for the 2019-2020 school year at Edmond North.

8. Board of Education of Edmond Public Schools is the governing entity for the Edmond Public School District and is the entity which performs and is charged with making policy and other decisions as respects to training and development of teachers, staff, and counselors of Edmond Public Schools.

## Compliance with the Governmental Tort Claims Act ("GTCA")

9. N.S. died by suicide on November 21, 2019. His father, Mr. Silagyi, found him dead in his room, hanging from a noose.

10. Mr. and Mrs. Silagyi on or about July 17, 2020 submitted a Notice of Claim under the GTCA to Mr. Bret Towne, Ms. Judy Pendergraft and Edmond Public Schools. Such Notice set out the factual circumstances underlying Plaintiffs' present claims. It was received on behalf of Edmond Public Schools on or about July 17, 2020.

11. None of the recipients, including Edmond Public Schools, made a response to the GTCA Notice submitted on behalf of the Silagyi family and the Estate of N.S..

2

12. The GTCA Notice was deemed denied after 90 days, on or about October 15, 2020.

13. Plaintiffs have filed this action within 180 days after the GTCA Notice was deemed denied by operation of law.

## Count I- Negligence- Independent School District No. 12, Edmond Public Schools

14. At all materials times herein, specifically in the fall of the 2019-2020 academic year, Kendall Allen was a freshman English teacher with Edmond North High School, and, at all materials times herein, she acted in the course and scope of her employment as a teacher of N.S., a student in her freshman Pre-AP English class in the 2019-2020 school year.

15. Allen, acting within the course and scope of her employment as an English teacher, gave an assignment in August 2019 to her freshman students, including N.S., to write a "personal odyssey" paper about a challenge they had overcome or were working to overcome. The assignment was titled "Personal Reflection: Facing Adversity."

16. N.S. prepared his paper, through several revisions, on a school issued Chromebook and ultimately turned in that paper to Ms. Allen in the usual manner, through the education computer programs used by Edmond North students, on or about August 27, 2019, the day it was due.

17. N.S.'s paper was replete with indications that he was in need of mental health assessment and treatment, including, but not limited to, parentheticals inserted in the narrative throughout that commented upon preceding content and spoke in a demeaning and knowing tone to the one writing the content, conveying a sense of double voice or dual personality. Any teacher at any level should have a) noted the concerning construct and tone in this respect, b) immediately taken steps to communicate with N.S.'s parents, and c) immediately taken steps to connect N.S. to school administrators and/or mental health services for an assessment of any potential mental health needs and treatments indicated.

3

18. Further, N.S.'s paper was starkly titled "Running Out of Reasons" and also contained several references to self-harm and suicide, expressed both by the primary speaker and also by the secondary, parenthetical voice.

19. Ms. Allen read N.S.'s paper and took no action to report the situation to school administrators or counselors or *even inquire* as to suitable next steps. She did not report to anyone in administration the obvious signs and symptoms of both suicide and mental health issues that the paper plainly exhibited as to N.S. and his condition in August 2019.

20. Nor did Ms. Allen communicate with Mr. and Mrs. Silagyi, N.S.'s parents, in the weeks immediately after reading their son's troubling paper and giving it a 100% grade.

21. Upon information and belief, an established practice, sanctioned by Edmond Public Schools, provided, at the time, some measure of expectation of Edmond Public Schools that should a teacher become aware of a student's expressed suicidal ideation or heightened risk thereof, this teacher should inform a school counselor promptly, who would then contact the student's parents. This generalized framework was to be followed by all teachers and staff-- although such framework was vague and not effectively communicated by administrators or installed through regular and systematic training.

22. Ms. Allen utterly failed to follow this practice or any similar practice after reading N.S.'s paper, and this failure in the face of the disturbing, salient warning of N.S.'s paper in August 2019 caused and/or contributed to his death in November 2019.

23. After having turned in this assignment to his teacher in late August 2019 to the time of his death in November 2019, N.S. was never appropriately addressed (neither by Allen nor any other teacher, employee or agent of Edmond Public Schools) about his paper and the concerning health and safety issues sounded therein.

24. Neither Ms. Allen nor any other Edmond Public School employee ever referred N.S. to see and speak with any professional or person, either employed by Edmond Public Schools, or with whom it maintained a contract or agreement for the ostensible purpose of guarding the health and safety of its students. Upon information and belief, Edmond Public Schools had such an agreement/ partnership with a local counseling entity, but that option was never invoked or utilized in any manner for N.S.

25. Ms. Allen's failure to take any appropriate action, such as promptly connecting with N.S.'s parents or school officials, about what she had read concerning N.S.'s mental condition in August 2019 fell below the standard of care that is to be expected of a freshman high school teacher, or any teacher, given the context and circumstances of the particular situation, one plainly signaling the danger of self-harm and mental disturbance. As a teacher and authority for her students, Ms. Allen breached a duty to reasonably guard the safety of her students and to take reasonable care in acting upon situations that imperil such safety or that point up a danger to be acted upon by the reader/ hearer. Furthermore, she also failed to warn of clearly expressed self-harm from a minor student, as required by Oklahoma law.

26. Ms. Allen, acting within the course and scope of her employment with Edmond Public Schools, failed to use ordinary care with respect to N.S.'s odyssey paper, "Running Out of Reasons," and N.S., ignoring a glaring risk to N.S.'s safety that she either knew or certainly should have known existed as of August 27, 2019, one she did not address and that manifested into the death of N.S. in November 2019.

27. During a parent teacher conference on or about October 8, 2019, Ms. Allen told Mr. and Mrs. Silagyi that she was worried about N.S. because he seemed like a "troubled soul." When Mr. and Mrs. Silagyi asked her what she meant by this comment, Ms. Allen refused to explain,

5

stating that she did not want to violate or betray N.S.'s trust. Ms. Allen would not answer Mr. and Mrs. Silagyi's significant question about their son. Not communicating with N.S.'s parents at all after the paper was written, Ms. Allen, in October 2019, effectively blocked them from any meaningful information about N.S.'s paper, which was a window into the disturbed mentality of N.S.. Evidently, Ms. Allen opted to safeguard an ill-defined dynamic of trust between her and N.S., her student, rather than share information which Mr. and Mrs. Silagyi deserved and needed to hear and know as parents.

28. Mr. and Mrs. Silagyi left that parent teacher conference in October 2019 with only Ms. Allen's thin, vague comments and references to N.S.'s mature and sometimes dark sense of humor, which Ms. Allen stated she enjoyed. Despite the face-to-face meeting and questions posed to Ms. Allen during it, N.S.'s parents remained in the dark about what N.S. had shared about himself and his mental condition in the personal odyssey paper in late August 2019.

29. Mr. and Mrs. Silagyi first learned of the existence of this paper, "Running Out of Reasons," when they discovered it in N.S.' phone after it was returned to them by the Edmond Police in the weeks after his death. They were heartbroken to discover it. Had Mr. and Mrs. Silagyi been informed by Ms. Allen or by anyone associated with Edmond Public Schools of this August 2019 paper, and its suicidal content and mental health indicia, they would have known and thus been able to address the situation and to choose a different course from August to November 2019 and N.S. would not have lost his life; they would not have lost their son.

30. On or about October 8, 2019, Ms. Allen failed to use ordinary care in hearing and declining to respond to paramount, parent questions about the mental health of their son.

31. While acting within the course and scope of employment, Ms. Allen's material and several omissions, singularly and/or in combination, breached the duty of ordinary care and

6

caused or contributed to N.S.'s death and, thus, Plaintiff's damages sought herein.

32. On or about November 12, 2019, N.S. told his mother, Mrs. Silagyi, that he made a comment in class in response to a question posed by Ms. Allen along the lines of how the class would make money for your family if students lost everything in the dust bowl and stock market. N.S. told his mother he asked a question that got the class talking and that Ms. Allen had to re-direct the class to a new topic to re-focus it.

33. On or about November 12, 2019, Mrs. Silagyi emailed Ms. Allen, explaining that N.S. was supposed to apologize for disrupting the class. Apparently, unbeknownst to Mr. or Mrs. Silagyi, N.S., in response to Ms. Allen's assignment/question, had made a joke about dismemberment. Ms. Allen never told Mr. or Mrs. Silagyi about the dismemberment comment, either after it was made or even after Mrs. Silagyi had emailed her. Mr. and Mrs. Silagyi did not know of such dismemberment comment until Ms. Allen put it in her affidavit that was given, in April 2020, to counsel for Edmond Public Schools.

34. In effect, another reference to physical harm was kept by Ms. Allen and not relayed to N.S.'s parents, despite extant communication lines. At all materials times in 2019, Ms. Allen never herself initiated any communication about N.S. to his parents.

35. Further, on or about November 12, 2019, Mrs. Silagyi asked, in the course of the email communication, to meet with Ms. Allen to talk with her about how N.S. was doing in class. A phone conference was set for the next day, but the next day something came up with Ms. Allen, who never communicated with Mrs. Silagyi to re-schedule or explain her missing the conference.

36. On or about November 14, 2019, Mrs. Silagyi received a call from Tara Chase, 9th grade counselor at Edmond North High School, although Mrs. Silagyi's school phone number was not listed on any of N.S.'s emergency contact phone numbers. Ms. Chase said that she had heard

7

from a parent of another Edmond North student; this student had apparently received text messages from N.S. indicating N.S. was hearing voices. Mrs. Silagyi asked if she could see the text messages and Mrs. Chase said "no". Mrs. Silagyi asked if she could have the name of the other parent, and Mrs. Chase said "no". Mrs. Silagyi asked if she could be told what the text messages said, and Mrs. Chase said "no". So the call ended with Ms. Chase having conveyed no information to Mrs. Silagyi in response to the latter's many questions and also having admitted she did not try to talk with N.S..

37. Ms. Chase, counselor, acting within the course and scope of her employment with Edmond Public Schools, neglected to take any steps to speak with N.S., failing to fulfill her role as a school counselor.

38. Similar to Ms. Allen, Ms. Chase, as a school counselor, kept the details of the information of N.S. reportedly hearing voices to herself and took no steps to speak with him or to connect him to a mental health professional. In doing so, she failed to use ordinary care as a high school counselor, and her lack of prudence caused or contributed to N.S.'s death at a time, on November 14, 2019, when his mental health issues could have been addressed directly and properly and his mental decline arrested.

39. N.S. died by suicide one week later, November 21, 2019, leaving a suicide note of four words: "Ran Out of Reasons."

40. After N.S. died by suicide, Mrs. Silagyi contacted Ms. Allen and asked for examples of his writing, and Ms. Allen sent her a short story but not the "Running Out of Reasons" paper.

41. As a direct result of the actions and inactions of Allen and Chase, acting with the course and scope of their employment, Plaintiffs have been immensely and irreparably harmed by losing their son. Plaintiffs seek all damages available under the law of Oklahoma, including but not

8

limited to those available in 12 O.S. § 1055, including but not limited to the emotional distress suffered by Mr. and Mrs. Silagyi.

## Count II- Negligence -Kendall Allen

42. Plaintiffs incorporate by reference as if fully set forth herein paragraphs 1 – 41.

43. In the alternative, Kendall Allen was acting outside the course and scope of her employment either in not promptly communicating with Mr. or Mrs. Silagyi in late August 2019 and/or in choosing to not answer their questions during the parent teacher conference of October 2019, inasmuch and to the extent her actions and omissions exhibit a lack of good faith and show a marked departure from a teacher performing her duties for a public school district.

44. Ms. Allen's comments to Mr. and Mrs. Silagyi that she wanted to "figure out N.S." and her decision to withhold suicidal information from the parents of an endangered youth evince a personal choice and show her departing from the path and scope of doing the work of her employer, Edmond Public Schools.

45. As a direct result of the actions and inactions of Ms. Allen, acting outside the course and scope of her employment, Plaintiffs have been harmed by losing their son. Plaintiffs seek all damages available under the law of Oklahoma, including, but not limited to, those available in 12 O.S. § 1055, including but not limited to the emotional distress suffered by Mr. and Mrs. Silagyi.

## Count III- Concealment/ Misrepresentation- Kendall Allen

46. Plaintiffs incorporate by reference as if fully set forth herein paragraphs 1 – 45.

47. With respect to Ms. Allen's actions and omissions, set forth above, during the October 2019 parent teacher conference, Ms. Allen's behavior constitutes concealment and/or misrepresentation of vital information Mr. and Mrs. Silagyi had a natural, legal and pressing need to have before N.S.'s death.

9

48. Plaintiffs bring state law negligence, concealment and misrepresentation claims against Ms. Allen individually as acting outside the course and scope of her employment as a teacher with Edmond Public Schools.

49. Ms. Allen's actions and omissions, done outside the course and scope of her employment with Edmond Public Schools, caused or contributed to the death of N.S., being that the knowledge of his mentality and suicidal thoughts was kept within the mind of Ms. Allen.

50. As a direct result of the actions and inactions of Ms. Allen, acting outside the course and scope of her employment, Plaintiffs have been harmed by losing their son. Plaintiffs seek all damages available under the law of Oklahoma, including, but not limited to, those available in 12 O.S. § 1055, including but not limited to the emotional distress suffered by Mr. and Mrs. Silagyi and all manner of damages naturally flowing from the act of concealment/ misrepresentation.

## Count IV- Breach of Contract-
## Board of Education, Independent School District No. 12, Kendall Allen

51. Plaintiffs incorporate by reference as if fully set forth herein paragraphs 1 – 50.

52. Upon information and belief, Board of Education and Independent School District No. 12 entered into a binding agreement ("master teacher contract") with the Edmond Association of Classroom Teachers, and this agreement served as the Master Agreement between Edmond Public Schools and its classroom teachers for the 2018-2019 school year. Upon information and belief, the same or substantial similar agreement was in effect for the 2019-2020 school year.

53. The master teacher contract provided an expectation for teachers to address the safety of Edmond Public School students under their care and supervisor during the school day. For example, Article 12(B) reads in pertinent part, "The District, through its administration or through the IEP team process, if applicable, will recommend the attention of a counselor, social worker, physician or other professional for a student under appropriate circumstances."

54. Edmond Public School students, such as N.S. in August through November 2019, are intended or implied third party beneficiaries under this master teacher contract in its provisions for the safety of students relative to the roles of administration and teachers and the goal of seeking to protect the health and safety of Edmond Public School students.

55. Upon information and belief, Ms. Allen was a member of the Edmond Association of Classroom Teachers or was otherwise included, as a beneficiary or party, in the force and effect of the master teacher contract for the 2019-2020 school year with Edmond Public Schools.

56. In the failure of Ms. Allen to bring the aforementioned health and safety concerns as to N.S. to the attention of anyone within Edmond Public Schools, or, in the alternative, to do so only in a substandard fashion, Ms. Allen breached the master teacher contract and disrupted and denied the rights and benefits flowing to N.S., as a student, under this contract. N.S. was not afforded by Edmond Public Schools the attention of any the noted professionals, as intended and promised, and Edmond Public Schools thus breached their duties and promises to third party beneficiary N.S. in this respect.

57. The breach of this contract by Ms. Allen and Edmond Public Schools and Board of Education caused or contributed to the death of N.S. in November 2019.

58. Additionally, an implied contract arose from the master service contract and the context of its facts and circumstances to the effect that the District and its teachers promised to not ignore or fail to handle or address a risk of suicide or mental health needs of which either District or any of its teachers became aware. Ms. Allen breached this implied contract, resulting in damages to Plaintiffs herein.

59. As a direct result of the breaches noted herein, Plaintiffs seek all damages available under the law of Oklahoma, including, but not limited to, those available in 12 O.S. § 1055,

11

including but not limited to the emotional distress suffered by Mr. and Mrs. Silagyi and other just and proper forms of contractual and extra-contractual relief.

## Count V- Civil Rights Section 1983
## Fourteenth Amendment Violations - Kendall Allen

60. Plaintiffs incorporate by reference as if fully set forth herein paragraphs 1 – 59.

61. Ms. Allen had actual and specific awareness of N.S.'s suicidal ideations when she read his paper that contained them and, given the repetition, *emphasized* them. For example, she had actual and specific awareness of the elevated risk of self-harm and suicide to N.S. when she read the following words in N.S.'s "Running Out of Reasons":

> Im probably going to have to talk with the principal for this but i developed some suicidal thoughts(**really just thoughts?I don't remember it that way,if only it wasn't as dull then we wouldn't be having this conversation. Plus remember September 11,it landed on death so why are you still here.**).but it was originally only when I was alone.

(bolding original).

62. Also, Ms. Allen had actual and specific awareness of the elevated risk of self harm and suicide to N.S. when she read the following words in N.S.'s "Running Out of Reasons":

> I've started dehumanizing myself I guess, if that's the right word. I don't feel like there's any point to anything anymore, and I no longer like myself so that's fun I guess.I just no longer care about anything.
> \*\*\*\*\*
> I mean who's left to notice me when I'm gone? Who's left too care? who cares anyway? (**I don't that's for sure. Isn't that why I'm here? And if you don't care than please just stop trying).**
>
> **Just stick with your decade day plan,the whole "going out with a bang thing". You really like puns don't you? At least you kept that.**

(bolding original). These thoughts and cries for help were written by N.S. himself and read by Ms. Allen, as the freshman English teacher who gave the assignment to N.S. and her students.

63. Ms. Allen read N.S.'s "Running Out of Reasons" in late August 2019 and gave it a

12

100% grade.

64. Despite this awareness of a substantial risk of serious harm to N.S., Ms. Allen disregarded and did not convey it, in any manner, to his parents or to her administration so that the pressing risk could be addressed. Ms. Allen, by virtue of reading several pages of both troubling and suicidal content, knew N.S. was in serious danger of self-harm and simply bypassed that danger, not responding as teacher, adult or professional.

65. Additionally, when Ms. Allen was asked directly for substance behind her puzzling comment of "troubled soul," she refused to give any such substance, further concealing N.S.'s paper and his mindset from N.S.'s parents in October 2019 at the parent teacher conference.

66. Her action of actively blocking N.S.'s parents from learning key information about the mental health of their son, during a conference designed to facilitate the transfer of knowledge from teacher to parent(s), only heightened the danger to N.S. during the last several weeks of his life, making him more insulated and more subject to his thoughts alone, which were unknown to Mr. and Mrs. Silagyi at the time. N.S.'s parents were never able to read his words in "Running Out of Reasons" essay until he was dead.

67. As the English teacher of N.S., Ms. Allen's actual awareness, disregard, and choice to keep N.S.'s parents in the dark, ostensibly choosing to prioritize the "trust" between herself as teacher and student and choosing to conceal vital information from his parents, shocks the conscience and violated the substantive due process rights of N.S. and his parents.

68. Such facts, collectively, evince a failure of Ms. Allen, an adult and teaching professional, to protect N.S., a fifteen-year-old boy, from a known or obvious substantial risk of serious harm, initially in August 2019, followed by Ms. Allen's act to affirmatively conceal such underlying facts and danger from Mr. and Mrs. Silagyi in October 2019.

13

## Count VI- Civil Rights Section 1983 Denial of Medical Care
### Fourteenth Amendment Violation- Kendall Allen

69. Plaintiffs incorporate by reference as if fully set forth herein paragraphs 1 – 68.

70. Ms. Allen, as a freshman teacher at Edmond North High School, regularly read the words and thoughts of many youth entering or proceeding through the high school phase of their lives. Upon information and belief, there was no program or arrangement at Edmond North whereby each student would meet with a counselor on a regular basis.

71. When Ms. Allen read N.S.'s paper and acquired actual, specific knowledge of his mental health issues, including, but not limited to, suicidal ideations, she had the ability and duty to refer N.S. to a counselor, administrator, or to otherwise begin the process of referring N.S. to either a counseling group which partnered with Edmond Public Schools or to another entity to address these urgent issues.

72. Having such awareness and such a position within the infrastructure of Edmond Public Schools, Ms. Allen failed to relay her knowledge or trigger any process or means to address the serious mental health needs of which she knew in late August 2019.

73. The totality of facts and circumstances recounted herein shows that Ms. Allen was deliberately indifferent to the serious mental health needs of N.S., which, without a proper response and intervention, would tragically deteriorate into N.S. taking his own life on November 21, 2019.

74. Ms. Allen disregarded a known or obvious serious mental health disturbance and need in N.S. and this disregard was a substantial factor and moving force in causing N.S.'s mentality to continue to erode to the point of N.S. committing suicide.

## Count VII- Civil Rights Section 1983- Municipal Liability
### Failure to Train – Edmond Public Schools, Board of Education

14

75. Plaintiffs incorporate by reference as if fully set forth herein paragraphs 1 – 74.

76. According to the State of Oklahoma Department of Health, on average, two youth die by suicide every week. Suicide is the second leading cause of death for youth ages 10-24 in Oklahoma, and 50% of all mental health disorders emerge by the age of 14.

77. Youth suicide in America has been an escalating, widely publicized problem in the last 15 years. In Oklahoma, according to data compiled by Oklahoma Violent Death Reporting System and Oklahoma Youth Risk Behavior Survey through 2015, and available for review well before the 2019-2020 school year, the Oklahoma youth male suicide rate increased 23% since 2006, and the youth female suicide rate increased 79% in the same time frame.

78. Oklahoma Youth Risk Behavior Survey (YRBS) Data from the Oklahoma 2015 survey showed that more than one-fourth (28.9%) of public high school students reported feeling so sad or hopeless almost every day for two or more weeks in a row that they stopped doing usual activities. More than one in seven students (15.1%) seriously considered attempting suicide, 14.6% made a plan about how they would attempt suicide, 7.4% attempted suicide, and 2.0% had a suicide attempt that resulted in an injury, poisoning, or overdose that had to be treated by a doctor or nurse.

79. As of the beginning of the 2019-2020 school year, despite the prevalence and gravity of consequences of suicide amongst middle school and high school aged youth, Edmond Public Schools did not train its teachers in signs and symptoms of suicide and in reporting and arranging help for students who demonstrated such risks. Neither did Edmond Public Schools convey information to its teachers when a suicide attempt or suicide had occurred at other EPS schools.

80. Edmond Public Schools showed videos to students, at certain grades, as to such signs and symptoms, but it did not direct any meaningful and systematic training towards teachers, as

15

the adults to whom the signs and symptoms would most likely be manifested during the course of a school day and year.

81. In approximately 2012, Edmond Public Schools experienced multiple suicides amongst its students. While some measures were taken thereafter, these measures were largely encompassed by a video shown to students, not to teachers, and thus was not training afforded to teachers, counselors and staff. These measures did not include an integrated system of training for employees and agents to perceive and take action on suicidal ideations and risks.

82. Given the specific experience and knowledge of Edmond Public Schools and the general, societal prevalence of suicide as a known, increasing danger to students aged 10-18, the failure of Edmond Public Schools and the Board of Education of Edmond Public Schools, as of July 2019, to adopt any organized training for its teachers amounted to deliberate indifference to a highly predictable consequence and outcome that suicidal ideations and behaviors by its students would be, through written or verbal means, conveyed by students to teachers and either missed or perceived and not reported by its teachers, ultimately resulting in a tragic lost opportunity to avoid the loss of student lives.

83. Further, upon information and belief, such a lack of organized, systemic training, as of July 2019, in the face of the specific and general knowledge noted above, evinced deliberate indifference by Edmond Public Schools and the Board of Education to the scenario of a relatively new teacher to the district, such as Ms. Allen, not receiving any appropriate instruction whatsoever from Edmond Public Schools in how to perceive and respond to suicidal risk or mental health needs and, with an absence of this mental framework, the new teacher encountering such a pressing risk/need before he or she had come to be familiar, though an informal or roundabout way, with a loosely known practice of responding to a student who had

conveyed either suicidal thoughts or urgent mental health needs. Upon information and belief, this is the scenario that unfolded with respect to N.S., and it was a scenario, with plainly obvious, sad consequences, allowed to persist due to the lack of any training directed to relatively new teachers such as Ms. Allen.

84. Plaintiffs seek all compensable damages under federal law, including but not limited to the loss of life of N.S., the emotional distress suffered by Mr. and Mrs. Silagyi, and all manner of damages naturally flowing from the constitutional violations noted herein.

## Damages Sought

85. Plaintiffs incorporated by reference the damages sought as set forth in the state and federal law sections of the Petition, *supra*. Further, pursuant to 12 O.S. § 2008(A)(2), Plaintiffs state they are seeking in excess of the amount required for diversity jurisdiction pursuant to Section 1332 of Title 28 of the United States Code.

JURY TRIAL DEMANDED.

Respectfully submitted,

/s/ Bryan E. Stanton

Bryan E. Stanton, OBA #19225
Carson C. Smith, OBA #22303
PIERCE COUCH HENDRICKSON
BAYSINGER & GREEN, L.L.P.
1109 N. Francis Avenue
Oklahoma City, OK 73106
Telephone: (405)235-1611
Facsimile: (405)235-2904
bstanton@piercecouch.com
csmith@piercecouch.com
***Attorneys for Plaintiffs***