## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

DEZSÖ SILAGYI and MELISSA            )
SILAGYI, as Co-Administrators of     )
the Estate of N.S., deceased,        )
                                     )
            Plaintiffs,              )
                                     )
v.                                   )        Case No. CIV-21-607-SLP
                                     )
INDEPENDENT SCHOOL DISTRICT          )
NO. 12, OKLAHOMA COUNTY,             )
OKLAHOMA, a/k/a                      )
Edmond Public Schools, *et al.*,     )
                                     )
            Defendants.              )

## O R D E R

Before the Court is the Partial Motion to Dismiss Plaintiffs' Amended Complaint [Doc. No. 14] filed by Defendants Independent School District No. 12 of Oklahoma County, Oklahoma, also known as Edmond Public Schools ("District"), Kendall Allen ("Ms. Allen"), and Edmond Board of Education ("Board") (collectively, the "School Defendants").  Plaintiffs have responded [Doc. No. 15] and Defendants have replied [Doc. No. 22].[1]  The matter is fully briefed and ready for determination.

### I.    Introduction

This action involves state law claims for negligence, misrepresentation, and breach of contract in addition to federal question claims asserted under 42 U.S.C. § 1983 associated with the tragic death of a student at the District in 2019.  The School Defendants move for dismissal of the Board entirely, and for dismissal of Count IV

---

[1] Citations to the parties' submissions reference the Court's ECF pagination.

(breach of contract) and Counts V and VI (substantive due process claims asserted against Ms. Allen under § 1983 based on "state created danger" and "special relationship" theories). Mot. [Doc. No. 14] at 2-3. Defendants assert: (1) the Board is not a proper legal entity subject to suit; (2) Plaintiffs do not have standing to assert a breach of contract claim as third-party beneficiaries; (3) Plaintiffs fail to state § 1983 claims for state created danger or special relationship; and (4) Ms. Allen is entitled to qualified immunity on the § 1983 claims. *Id*.

In their Response, Plaintiffs assert the Board has capacity to be sued, but they concede to dismissal of the Board because the claims are duplicative of those asserted against the District. Resp. [Doc. No. 15] at 7-8. As to the breach of contract claim, Plaintiffs argue they have alleged sufficient facts to establish standing as third-party beneficiaries. *Id*. at 8-10. Finally, Plaintiffs assert they have sufficiently pleaded substantive due process claims based on state created danger and special relationship, and Ms. Allen is not entitled to qualified immunity. *Id*. at 10-25.

## II.    <u>Governing Standard</u>

A pleading must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. But "mere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Twombly*, 550 U.S. at 555). "Generally, the sufficiency of a complaint must rest on its contents alone." *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010).

## III.   <u>Factual Allegations of the Complaint</u>[2]

Plaintiffs filed this action against the District, its Board, Ms. Allen, and other Defendants after their son, N.S., died by suicide on November 21, 2019 in Edmond, Oklahoma. Am. Compl. [Doc. No. 12] ¶ 1. N.S. was a fifteen-year-old freshman at Edmond North High School at the time of his death. *Id.* ¶ 2. Ms. Allen was N.S.'s English teacher at Edmond North High School during the fall of 2019 when N.S. died. *Id.* ¶ 21.

In August of 2019, Ms. Allen gave an assignment to N.S.'s class requiring a "personal odyssey" paper about a challenge the students had overcome or were working to overcome. *Id.* ¶ 22. N.S. wrote his paper on a school-issued computer and turned in the assignment online on August 27, 2019. *Id.* ¶ 23. The paper N.S. turned in was titled "Running Out of Reasons" and included several references to self-harm and suicide, in addition to significant signs of mental health issues. *Id.* ¶¶ 24-25. Specifically, the paper

---

[2] The Court views the factual allegations of the Complaint in the light most favorable to Plaintiffs as the non-moving parties. *Straub v. BNSF Ry. Co.*, 909 F.3d 1280, 1287 (10th Cir. 2018).

included parentheticals throughout the narrative which conveyed a sense of two voices or dual personality, including comments on preceding content and comments which spoke in a demeaning tone to the author. *Id.* ¶ 24. The Amended Complaint provides specific examples of these parenthetical comments within N.S.'s paper. *Id.* ¶¶ 69-70. Plaintiffs allege Ms. Allen read and graded N.S.'s paper, but she never reported the situation to Plaintiffs or school administration, nor did she discuss the paper with N.S. or refer him to a school counselor or other professional. *Id.* ¶¶ 26-31.

Plaintiffs attended a parent-teacher conference with Ms. Allen on October 8, 2019. *Id.* ¶ 34. At that time, Ms. Allen told Plaintiffs she was worried about N.S. because he seemed like a "troubled soul." *Id.* Plaintiffs asked Ms. Allen what she meant by the "troubled soul" comment, but Ms. Allen refused to explain and stated she did not want to violate or betray N.S.'s trust. *Id.* Ms. Allen also made comments about N.S.'s mature and sometimes dark sense of humor, but she never mentioned N.S.'s paper. *Id.* ¶ 35. Plaintiffs did not find about N.S.'s paper until after his death, when his phone was returned to them by the police. *Id.* ¶ 36.

Plaintiffs allege additional opportunities arose for Ms. Allen or other employees of the District to notify them of their son's mental health struggles and risk of suicide. On November 12, 2019, Plaintiff Melissa Silagyi ("Mrs. Silagyi") emailed Ms. Allen after N.S. told Mrs. Silagyi he disrupted class that day. *Id.* ¶¶ 39-40. Mrs. Silagyi did not know what exactly N.S. said in class, but she learned after N.S.'s death he made a joke about dismemberment. *Id.* ¶ 40. Ms. Allen never told Plaintiffs about the dismemberment comment, either at the time or later. *Id.* Mrs. Silagyi and Ms. Allen

4

scheduled a phone call for November 13, 2019 to discuss N.S.'s behavior in class, but Ms. Allen was not able to attend and did not explain why or attempt to reschedule the meeting. *Id.* ¶ 42.

Additionally, on November 14, 2019, Mrs. Silagyi received a call from the ninth-grade counselor at Edmond North High School, Tara Chase ("Ms. Chase"). *Id.* ¶ 43. Ms. Chase told Ms. Silagyi that a parent of another student reported the student had received text messages from N.S. indicating he was hearing voices. *Id.* Plaintiffs allege Ms. Chase refused to provide details on when the texts were sent, who the other parent was, or what the texts said. *Id.* N.S. died by suicide one week later, on November 21, 2019. *Id.* ¶ 46.[3]

## IV.   Discussion

### A. Claims Against the Board

Plaintiffs assert claims against the Board under Count IV (breach of contract) and Count VII (§ 1983 municipal liability). Am. Compl. [Doc. No. 12] at 13, 18. Defendants' Motion asserts the claims against the Board are duplicative of those against the District, and the Board is not a separate legal entity under Oklahoma law. Mot. [Doc. No. 14] at 4-5. Plaintiffs appear to disagree, but the legal basis for their argument is unclear. *See* Resp. [Doc. No. 15] at 7-8. However, Plaintiffs concede to dismissal of the Board provided that their municipal claims against the District remain, and Plaintiffs acknowledge Defendants did not move for dismissal of the claims against the District. *Id.*

---

[3] The Court will address other relevant factual allegations as necessary below.

Under 70 O.S. § 5-105, the District "possess[es] the usual powers of a corporation for public purposes" and "may sue and be sued" under the proper legal name of the District, while the Board is the governing body of the District. *See id*. at § 5-106(A). Other courts interpreting these statutes have found "Oklahoma school boards are not separate, suable entities," and "claims against the school board are duplicative of claims against the school district" where the district is named as a defendant. *See, e.g., Primeaux v. Indep. Sch. Dist. No. 5 of Tulsa Cnty. Okla*., 954 F. Supp. 2d 1292, 1295 (N.D. Okla. 2012); *Isaacs v. Konawa Pub. Sch.*, No. CIV-20-187-KEW, 2021 WL 1229945, at *4 (E.D. Okla. Mar. 31, 2021), *aff'd*, No. 21-7016, 2022 WL 1100402 (10th Cir. Apr. 13, 2022) (dismissing § 1983 claims against a school board for the same reasons); *Smith v. Coyle Pub. Sch*., No. CIV-18-808-D, 2021 WL 4138415, at *1 n.3 (W.D. Okla. Sept. 10, 2021) (recognizing "the school board is not a separate and independent legal entity capable of being sued."). Consistent with these authorities and Plaintiffs' concession of dismissal, the claims against the Board are dismissed.

**B. Count IV – Breach of Contract**

Under Oklahoma law, the right of third-party beneficiaries to enforce contracts is fixed by statute. *G.A. Mosites Co. of Ft. Worth, Inc. v. Aetna Cas. & Sur. Co*., 545 P.2d 746, 749 (Okla. 1976) (citing 15 O.S. § 29). Section 29 provides: "[a] contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it." Oklahoma courts interpreting § 29 have explained it is not necessary for a party asserting third-party beneficiary status to be specifically named as a beneficiary, but the contract must be made "expressly for the benefit of a third person."

6

*Keel v. Titan Constr. Corp.*, 639 P.2d 1228, 1231 (Okla. 1981).   In this context, "expressly" means "in direct or unmistakable terms; explicitly; definitely; directly." *Id.* A third-party beneficiary may maintain an action on a contract even though he or she is a stranger to the contract, had no knowledge of it, and was not identified in the contract, if it appears the parties intended to recognize him or her as a beneficiary. *Id*.

Generally, "the determining factor as to the right of a third-party beneficiary is the intention of the parties who actually made the contract . . . the contract must have been intended for the benefit of the third person in order to entitle him to enforce it." *G.A. Mosites Co. of Ft. Worth, Inc*., 545 P.2d at 749.  The Court must evaluate the "intention of the parties to the contract as they are reflected in the contract." *Id.*; *see also Shebester v. Triple Crown Insurers*, 974 F.2d 135, 138 (10th Cir. 1992) ("The question is one of construction of the contract, determined by the terms of the contract.").  A party does not qualify as a third-party beneficiary if he or she only incidentally benefits from the contract. *See Copeland v. Admiral Pest Control Co*., 933 P.2d 937, 939 (Okla. Civ. App. 1996).

Here, Plaintiffs claim N.S. was a third-party beneficiary to the "Master Agreement" between the District and the Edmond Association of Classroom Teachers. Am. Compl. [Doc. No. 12] ¶¶ 60, 62.  Plaintiffs allege students at the District like N.S. were intended third party beneficiaries because the Master Agreement "provided an expectation for teachers to address the safety of Edmond Public School students under their care and supervis[ion] during the school day." *Id*. ¶ 61.  Plaintiffs specifically rely on a provision in Article 12(B) of the Master Agreement, which states: "The District,

through its administration or through the IEP team process, if applicable, will recommend the attention of a counselor, social worker, physician or other professional for a student under appropriate circumstances." *Id*. Plaintiffs further allege the Master Agreement contains "provisions for the safety of students" and has "the goal of seeking to protect the health and safety of Edmond Public School students." *Id*. at ¶ 62.

Accepting these factual allegations as true, the Court finds Plaintiffs have sufficiently stated a plausible claim that students like N.S. were intended third-party beneficiaries of the Master Agreement between the District and its teachers. The provision Plaintiffs quote expressly references students and provides for a benefit to those students where the District agreed to recommend professional help through a counselor, social worker, or physician in appropriate circumstances. More broadly, Plaintiffs allege the Master Agreement intended to protect the health and safety of the students, and the language quoted in the Amended Complaint supports that conclusion when viewed in the light most favorable to Plaintiffs.

In *Robertson v. Frontera Produce, Ltd*., the court found sufficient facts had been alleged to support a third-party beneficiary claim brought by the estate of a consumer who died from eating contaminated cantaloupe against a farm, a distributor, and the food safety company that inspected the produce. 2014 WL 12729280, at *6 (W.D. Okla. Jan. 23, 2014). Regarding the food safety auditing contract entered between the defendants, the Plaintiffs alleged:

> It was the intent of these contracting parties . . . to ensure that the facilities, premises, and procedures used by [the farm] in the production of cantaloupes met or exceeded applicable standards of care related to the

8

production of cantaloupe . . . [and] to ensure that the food products that [the defendants produced and distributed] would be of high quality for consumers, and would not be contaminated by potentially lethal pathogens, like Listeria.

*Id*.  The court found these allegations were sufficient to survive a motion to dismiss because the plaintiffs alleged the contract was made expressly for the benefit of consumers and the decedent was "a member of the class to which enforcement belongs." *Id*.  In the present case, Plaintiffs similarly allege the Master Agreement was made for the students' benefit and contained provisions intended to protect their health and safety, which would be sufficient for the same reasons as the Complaint in *Robertson*. However, Plaintiffs here have offered even more detail by quoting a provision in the contract which expressly mentions students and provides a benefit to those students when performed or enforced.  For these reasons, the Court finds Plaintiffs have sufficiently alleged N.S. was an intended third-party beneficiary.

## C. Section 1983 Claims

Plaintiffs' fifth and sixth causes of action assert substantive due process claims against Ms. Allen under 42 U.S.C. § 1983 and the Fourteenth Amendment.  Am. Compl. [Doc. No. 12] at 15, 17.  Defendants' Motion asserts Plaintiffs fail to adequately allege § 1983 claims under FED. R. CIV. P. 12(b)(6), but also claims Ms. Allen is entitled to qualified immunity.  Mot. [Doc. No. 14] at 8, 12, 13.  Although asserted at the end of Defendants' Motion, qualified immunity provides the governing framework for the Court's analysis of Plaintiffs' § 1983 claims.  *See Hunt v. Montano*, 39 F.4th 1270, 1284 (10th Cir. 2022) ("[w]hen a § 1983 defendant raises qualified immunity . . . the burden

shifts to the plaintiff to establish both prongs of the defense."); *see also Bledsoe v. Carreno*, 53 F.4th 589, 606 (10th Cir. 2022) ("[w]here, as here, defendants moved for dismissal of § 1983 claims under Rule 12(b)(6) based on qualified immunity, there is a presumption that the defendant is immune from suit." (internal quotation marks and citation omitted)).   "When a defendant raises a qualified immunity defense, the court must dismiss the action unless the plaintiff shows that (1) the defendant violated a statutory or constitutional right, and (2) the right was clearly established at the time of the violation." *Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016).   At this stage, "[a] plaintiff must allege sufficient facts that show—when taken as true—the defendant plausibly violated his constitutional rights, which were clearly established at the time of violation."   *Hernandez v. Ridley*, 734 F.3d 1254, 1258 (10th Cir. 2013) (internal quotation marks and citation omitted).

As to the second prong, Plaintiffs must identify "clearly established" law that would have notified Defendants their actions were unlawful.  *See Washington v. Unified Gov't of Wyandotte Cty.*, 847 F.3d 1192, 1202 n.3 (10th Cir. 2017).  Plaintiffs may show the law to be "clearly established" by citing an on-point Supreme Court or Tenth Circuit decision, or by showing "the clearly established weight of authority from other courts must have found the law to be" as Plaintiffs maintain.  *Grissom v. Roberts*, 902 F.3d 1162, 1169 (10th Cir. 2018) (internal quotation marks and citation omitted).  An on-point decision means the precedent is "particularized to the facts"—that it "involves materially similar facts" to the case at hand.  *Apodaca v. Raemisch*, 864 F.3d 1071, 1076 (10th Cir. 2017); *see also Mullenix v. Luna*, 577 U.S. 7, 12 (2015) ("The dispositive question is

whether the violative nature of *particular* conduct is clearly established.  This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." (internal quotation marks and citations omitted)).  In other words, on-point precedent cannot define a right at "a high level of generality."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).  There does not have to be "a case directly on point, but existing precedent [nonetheless] must have placed the statutory or constitutional question beyond debate."  *Frasier v. Evans*, 992 F.3d 1003, 1014 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 427 (2021) (quoting *al-Kidd*, 563 U.S. at 741).

The Court may consider both prongs of the qualified immunity analysis even though Defendants' arguments focus on the "clearly established" prong.  *See Hunt*, 39 F.4th at 1284-85 ("Even if the [defendants] failed to argue the clearly established prong in detail, as here, the [plaintiffs] still bore the burden to demonstrate that it was met" after qualified immunity was raised in a motion for judgment on the pleadings).  Relatedly, "[c]ourts have discretion to decide the order in which they address these two prongs." *Roberts v. Winder*, 16 F.4th 1367, 1374 (10th Cir. 2021) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).  Here, the Court will start with the first prong because of the overlap between the parties' Rule 12(b)(6) arguments and the requirement for Plaintiffs to show Ms. Allen violated a statutory or constitutional right.  However, as explained below, the Court finds Ms. Allen would be entitled to qualified immunity regardless of which prong the Court considers.

### i.   Count V – State Created Danger Claim

In the context of injuries inflicted by private actors, the Supreme Court has explained: "the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989).  "As a general matter . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."  *Id*. at 197.  Since *DeShaney*, The Tenth Circuit has recognized two exceptions to the general rule that state actors are not liable for private violence: (1) the "special relationship doctrine"; and (2) the "danger creation" theory.  *Uhlrig v. Harder,* 64 F.3d 567, 572 (10th Cir. 1995).  Plaintiffs appear to assert claims under both exceptions, and the Court will address the danger creation claim first.[4]

"Under the danger creation theory, state officials can be liable for the acts of third parties where those officials 'created the danger' that caused the harm."  *Marino v. Mayger*, 118 F. App'x. 393, 401 (10th Cir. 2004) (quoting *Armijo v. Wagon Mound Pub. Schs.*, 159 F.3d 1253, 1260 (10th Cir. 1998)).  The danger creation theory is a "narrow exception" that "applies only when a state actor 'affirmatively acts to create, or increases

---

[4] It is not clear from the Amended Complaint that Plaintiffs rely on a special relationship claim for Count VI (styled as "Denial of Medical Care").  Am. Compl. [Doc. No. 12] at 17.  Plaintiffs' Response suggests the claim "principally rel[ies] on the danger creation theory" but then states "[e]ither 'danger creation' or 'special relationship' acts as a predicate for Plaintiffs' federal claims and duty to protect and render medical care."  Resp. [Doc. No. 15] at 16-17 (emphasis omitted). The Court will construe Count VI as a special relationship claim because that is the only other recognized exception to the general rule set forth in *DeShaney*.

a plaintiff's vulnerability to, danger from private violence.'" *Moore v. Guthrie*, 438 F.3d 1036, 1042 (10th Cir. 2006) (quoting *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001)).   "To invoke the danger-creation exception, a plaintiff must establish as a threshold matter (1) private violence, and (2) affirmative conduct on the part of the state in placing the plaintiff in danger." *Hernandez*, 734 F.3d at 1259; *see also Est. of B.I.C. v. Gillen*, 710 F.3d 1168, 1173 (10th Cir. 2013).   If these preconditions are met, a plaintiff must then satisfy all elements of a six-part test:

> (1) the charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way; (2) plaintiff was a member of a limited and specifically definable group; (3) defendants' conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) defendants acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, is conscience shocking.

*Christiansen v. City of Tulsa*, 332 F.3d 1270, 1281 (10th Cir. 2003) (quoting *Gonzales v. City of Castle Rock*, 307 F.3d 1258, 1263 (10th Cir. 2002)).   Here, the Court does not proceed to the six-part test because the "affirmative conduct" precondition has not been met.

A state created danger claim cannot proceed without an "affirmative act" or "affirmative conduct" by the state official.  *See, e.g.*, *Graham v. Independent Sch. Dist. No. I–89*, 22 F.3d 991, 995 (10th Cir. 1994) (affirming dismissal of danger creation claims on a motion to dismiss because "plaintiffs cannot point to any affirmative actions by the defendants that created or increased the danger to the victims"); *Gray v. Univ. of Colo. Hosp. Auth.*, 672 F.3d 909, 920 (10th Cir. 2012) ("'affirmative conduct' is a necessary precondition to such application" (quoting *Graham*, 22 F.3d at 995)).   "The

13

affirmative conduct requirement typically involves conduct imposing 'an immediate threat of harm, which by its nature has a limited range and duration,' and is 'directed at a discrete plaintiff rather than the public at large.'" *Hernandez*, 734 F.3d at 1259 (quoting *Ruiz v. McDonnell*, 299 F.3d 1173, 1183 (10th Cir. 2002)).  Inaction, an omission to act, or even nonfeasance cannot be the basis of a danger creation claim.  *Gillen*, 710 F.3d at 1173 ("Our precedents consistently conclude that mere negligence or inaction is not enough."); *Graham*, 22 F.3d at 995 ("alleged nonfeasance in the face of specific information which would mandate action does not invoke the protections of the Due Process Clause.").

Here, Defendants argue Plaintiffs failed to allege affirmative conduct by Ms. Allen which created or increased an immediate risk of harm to N.S.  Mot. [Doc. No. 14] at 8-10.  As a general matter, Plaintiffs' claims against Ms. Allen rest on a failure to act—they allege Ms. Allen knew about N.S.'s suicidal thoughts and mental health struggles through his paper but failed to alert Plaintiffs or anyone in school administration.  *See* Am. Compl. [Doc. No. 12] ¶¶ 26-32.  Nevertheless, Plaintiffs assert in Response they have sufficiently alleged affirmative conduct by Ms. Allen to support a danger creation claim.  Resp. [Doc. No. 15] at 11.  Specifically, Plaintiffs point to their allegations regarding the parent-teacher conference in October, where Ms. Allen stated her belief that N.S. seemed like a "troubled soul" but then refused to explain her comment because she did not want to betray N.S.'s trust.  *Id*.; *see also* Am. Compl. [Doc. No. 12] ¶ 34.  Plaintiffs also rely on the allegation that Ms. Allen set up a meeting with Mrs. Silagyi to discuss N.S.'s

behavior in class but did not appear for the meeting or attempt to reschedule.  Resp. [Doc. No. 15] at 11.

The allegations Plaintiffs rely on constitute failures to act by Ms. Allen, or refusals to act at most.  Not answering questions and not showing up to a meeting are inherently omissions to act, regardless of whether one was asked to do so or was obligated to do so. The Amended Complaint specifically refers to Ms. Allen "[n]ot communicating," "declining to respond," and alleges she "would not answer [Plaintiffs'] significant question about their son" and "never communicated with Mrs. Silagyi to re-schedule or explain her missing the conference."  Am. Compl. [Doc. No. 12] ¶¶ 34, 37, 42.  Plaintiffs plead additional conclusory statements that Ms. Allen "actively block[ed] N.S.'s parents from learning key information" and "conceal[ed] vital information," but they do not offer additional facts with those conclusions, which are based solely on Ms. Allen's refusal to answer questions at the parent-teacher conference.  *See* Am. Compl. [Doc. No. 12] at ¶¶ 74, 75.

Accepting the factual allegations as true, even the refusal by Ms. Allen to answer questions at the parent-teacher conference does not change the conclusion because the Tenth Circuit has repeatedly found a refusal to act insufficient for a state created danger claim.  Most notably, in *Gonzales v. City of Castle Rock*, the Tenth Circuit affirmed dismissal of a state created danger claim based on multiple refusals by the police to enforce a restraining order because:

> Although in the present case Ms. Gonzales attempts to characterize defendants' conduct as affirmative interference with the protection provided by the restraining order, in the end the individual defendants

> simply failed to act by refusing to enforce the order . . . This lack of
> affirmative conduct is fatal to Ms. Gonzales' substantive due process claim.

307 F.3d 1258, 1263 (10th Cir. 2002), *on reh'g en banc*, 366 F.3d 1093 (10th Cir. 2004),

*rev'd on other grounds sub nom. Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748

(2005).[5]   In *Gonzales*, the plaintiff contacted the police multiple times asking them to

enforce a restraining order after her children were abducted by her ex-husband, but the

police refused to do so each time. *Id*. at 1261.  The plaintiff's children were murdered by

her ex-husband that same evening. *Id*. at 1262.

Other cases have similarly found a refusal to act is not affirmative conduct to

support a state created danger claim.  *See, e.g.*, *Est. of B.I.C. v. Gillen*, 761 F.3d 1099,

1107 (10th Cir. 2014) (finding allegations regarding refusals to act were only "failures to

act," including refusal by the defendant-social worker to accept a CD with pictures of

abuse, refusal to return phone calls from the police, and refusal to substantiate allegations

of abuse); *see also Price-Cornelison v. Garvin Cnty., Oklahoma*, No. CIV-04-241-W,

2004 WL 7338331, at *3 (W.D. Okla. Apr. 27, 2004) ("A failure to act by refusing to

enforce an order is not affirmative conduct").   As to the meeting Ms. Allen failed to

attend, at least one other court in the Tenth Circuit has similarly observed "a failure to

meet, with nothing else, does not constitute affirmative action" for a state created danger

---

[5] *Gonzales* has a lengthy procedural history which culminated in the Supreme Court's decision reversing the *en banc* decision of the Tenth Circuit. *See Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748 (2005).  However, the state created danger analysis is found in the Tenth Circuit's panel opinion issued prior to the *en banc* decision reversed by the Supreme Court. That portion of the decision is undisturbed by the subsequent procedural history because state created danger was not at issue in either the *en banc* opinion or before the Supreme Court. *Gonzales*, 366 F.3d 1093, 1099 n.3 (10th Cir. 2004) ("The *en banc* court was not asked to address the district court's dismissal of Ms. Gonzales' substantive due process claim and the panel's affirmance thereof. Hence, that portion of the panel opinion remains undisturbed.").

claim. *Garcia v. Patton*, No. 14-CV-01568-RM-MJW, 2016 WL 879635, at *18 n.23 (D. Colo. Mar. 8, 2016), *aff'd sub nom. T.D. v. Patton*, 868 F.3d 1209 (10th Cir. 2017). Finally, Ms. Allen's comment at the parent-teacher conference explaining her refusal to answer Plaintiffs' questions because she "did not want to violate or betray N.S.'s trust" does not establish affirmative conduct because it "amount[s] only to Defendant's explanation[] for her refusal to act." *Gillen*, 761 F.3d at 1107-08.

The "safety valve" cases Plaintiffs rely on do not negate the affirmative act requirement and are distinguishable because they clearly involved affirmative conduct. First, *Currier v. Doran* found sufficient affirmative conduct where the one of the defendant social workers instructed the mother of the victims to stop making allegations of abuse despite previously seeing signs of abuse and knowing about multiple reports from witnesses about abuse. 242 F.3d 905, 910, 921-22 (10th Cir. 2001). Similarly, in *Kuyper v. Bd. of Cnty. Comm'rs of Weld Cnty., Colo*., the defendant social workers affirmatively told two foster parents the child they were placing in their home had no history of sexual abuse or misconduct, even though the social workers knew the child had such history. *See* No. CIV09-00342, 2010 WL 1287534, at *1, *6 (D. Colo. Mar. 30, 2010). Finally, in *Armijo v. Wagon Mound Pub. Sch.*, the Tenth Circuit found sufficient affirmative conduct in the context of a student who died by suicide where school administration drove the student home and left him there with no parental supervision, despite knowing about the student's mental health issues, prior threats of suicide, and that

the student had access to firearms in the home. *See* 159 F.3d 1253, 1256-57, 1264 (10th Cir. 1998).[6]

The allegations in this case are clearly distinguishable from those in *Currier*, *Kuyper*, and *Armijo*.  Here, Plaintiffs allege Ms. Allen failed to tell anyone about N.S.'s risk of suicide or his concerning paper, and that she refused to answer questions regarding her "troubled soul" comment.  By nature, these are omissions to act or refusals to act, even if done intentionally, which are different for purposes of an "affirmative act" than the defendants' instruction to stop reporting abuse in *Currier*, the false statement regarding the child's history of sexual misconduct in *Kuyper*, and the act of driving the student home in *Armijo*.  Accordingly, these cases do not support a cause of action for state created danger on the facts Plaintiffs allege.[7]

Plaintiffs also quote dicta in *Hernandez v. Ridley*, but the Court finds that case distinguishable as well.  *Hernandez* involved claims brought by the estates of two construction workers against their employer, Duit Construction, and two Oklahoma Department of Transportation ("ODOT") employees after the workers died on an interstate construction project due to unsafe conditions.  *Hernandez*, 734 F.3d at 1256-57.

---

[6] Notably, the Tenth Circuit recognized the facts in *Armijo* were "very thin to establish a number of the six factors required for liability" on a state created danger claim.  *Id*. at 1264 n.9.

[7] Plaintiffs cite additional cases from other Circuits, Resp. [Doc. No. 15] at 12, but those cases are not persuasive in this context because state created danger analysis is highly Circuit-specific and there has been no state created danger decision by the Supreme Court.  Moreover, for purposes of the "clearly established" prong of qualified immunity (discussed below), the block quote Plaintiffs cite is insufficient to "create a clearly established weight of authority." *Sandberg v. Englewood, Colorado*, 727 F. App'x 950, 962 (10th Cir. 2018) ("this court generally looks to whether a 'majority of courts' have adopted the rule in question." (quoting *Panagoulakos v. Yazzie*, 741 F.3d 1126, 1131 (10th Cir. 2013))).

As to ODOT's director, the Tenth Circuit affirmed dismissal of a state created danger claim because the alleged failure to promulgate safe conditions for road construction in Oklahoma was "not affirmative conduct but rather inaction, which is insufficient." *Id*. at 1260. However, the court found "a marginally closer question" as to the ODOT engineer supervising the project, Mr. Henderson, who denied requests from Duit Construction for lane closures and speed reductions and failed to take actions which would have allegedly allowed more time to improve safety conditions. *Id*. The court agreed the denial of Duit's requests and related failures were "not mere inaction but can be viewed as affirmative conduct" because "Henderson took these actions in response to specific requests from Duit." *Id*. Notwithstanding that discussion, the court held the claims against Henderson suffered from "a more glaring problem"—the plaintiff had not alleged facts demonstrating it was Henderson whose conduct created the danger as opposed to Duit proceeding with the job prior to any lane closures. *Id*. 1260-61. The court also found Henderson's conduct was "a far cry from conscious shocking." *Id*. at 1261.

Setting aside the fact that the *Hernandez* court ultimately found no constitutional violation by either ODOT employee, the "affirmative conduct" alleged in that case is notably different from Ms. Allen's refusal to answer questions at the parent-teacher conference. In *Hernandez*, Mr. Henderson was repeatedly asked to decide on lane closures and other matters, and he did make decisions on the requests. *Id*. at 1259-60. Even though it resulted in nothing being done, Mr. Henderson's denials of various requests is closer to affirmative conduct than Ms. Allen's refusal to answer questions or failure to show up at a meeting—a denial is an actual response to the request rather than

an omission or refusal to respond altogether.  These cases would be more similar if, for example, Ms. Allen had answered Plaintiffs' questions and denied anything was wrong with N.S. or retracted her statement about N.S. being a "troubled soul."

Read as a whole, Plaintiffs' claims against Ms. Allen are based on a failure to say something about N.S.'s mental health struggles and risk of suicide, which is insufficient for a state-created danger claim.  Ms. Allen's refusal to answer questions at the parent-teacher conference is more consistent with the refusals to enforce the protective order in *Gonzales* (despite multiple requests to do so) and the refusals to investigate abuse in *Gillen* (also despite being asked to do so) than the denials of the requests for lane closures and other matters in *Hernandez*.  Without affirmative conduct for a state-created danger claim, Plaintiffs are unable to establish a violation of their substantive due process rights, and Ms. Allen is entitled to qualified immunity.

Finally, Ms. Allen would be entitled to qualified immunity regardless of whether the Court considers the first or second prong of the qualified immunity analysis.  In their Response, Plaintiffs assert two general propositions for their "clearly established" constitutional right: (1) the "safety valve" principle based on *Currier*, *Kuyper*, and *Armijo*, which refers to cases where a state actor "cuts off potential sources of private aid" and removes "what would otherwise be safety valves"; and (2) the general rule that state actors can be liable for conduct which increases the "plaintiff's vulnerability to the danger," also based on *Currier*.  Resp. [Doc. No. 15] at 19-23.  However, "a general statement of law—such as that a state cannot increase one's vulnerability to private

violence—is not sufficient to show that the law was clearly established." *Gillen*, 761 F.3d at 1106.

Moreover, as explained above, *Currier*, *Kuyper*, and *Armijo* all recognized affirmative conduct is required, and each of those cases clearly involved affirmative conduct unlike anything Plaintiffs allege here.  Given that crucial difference as to a "necessary precondition" of a danger creation claim, the cases Plaintiffs rely on are "are simply too factually distinct to speak clearly to the specific circumstances here." *Est. of Reat v. Rodriguez*, 824 F.3d 960, 967 (10th Cir. 2016), *as amended on reh'g in part* (Aug. 12, 2016) (internal quotation marks and citation omitted) ("Though the state-created danger doctrine itself may be clearly established, it is far from clear that it applies to [the defendant's] conduct in this particular situation.").  Plaintiffs cite no case—let alone a Supreme Court or Tenth Circuit case—imposing state-created danger liability based solely on a failure to act or a refusal to act, and any such case would indeed run contrary to *Gonzalez*, *Gillen*, and other cases dismissing danger creation claims for lack of affirmative conduct.  For all of these reasons, the Court finds Ms. Allen is entitled to qualified immunity.

### ii.  Count VI – "Denial of Medical Care"

As previously noted, Plaintiffs' Amended Complaint does not clearly plead a "special relationship" claim, but their Response asserts they rely on either danger creation or special relationship for purposes of their sixth cause of action styled as "Denial of Medical Care."  Resp. [Doc. No. 15] at 16-17.  Danger creation is addressed in Section IV(C)(i), above, so the present analysis will focus solely on special relationship.

The special relationship doctrine is one of two exceptions to the general rule that "state actors are generally only liable under the Due Process Clause for their own acts and not for private violence." *Uhlrig*, 64 F.3d at 572.  A special relationship "exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual." *Johnson v. Holmes*, 455 F.3d 1133, 1143 (10th Cir. 2006) (quoting *DeShaney*, 489 U.S. at 199-200).  The special relationship doctrine is implicated when the State impairs an individual's ability to act on his own behalf, either "through incarceration, institutionalization, or other similar restraint of personal liberty." *See Armijo*, 159 F.3d at 1261 (quoting *DeShaney*, 489 U.S. at 200).  To prevail under the special relationship doctrine, "a plaintiff must show involuntary restraint by the government official." *Id*.

Here, Plaintiffs fail to allege a factual basis for reliance upon the special-relationship doctrine, which requires involuntary restraint by the government.  Numerous courts have held "mandatory school attendance laws are not sufficient to give rise to a special relationship." *See, e.g., Nation v. Piedmont Indep. Sch. Dist. No. 22*, No. CIV-18-1090-R, 2019 WL 4452953, at *8 (W.D. Okla. Sept. 17, 2019); *see also Maldonado v. Josey*, 975 F.2d 727, 733 (10th Cir. 1992) ("compulsory attendance laws do not impose the severe restraints on individual liberty that implicate the Due Process Clause of the Fourteenth Amendment."); *Sutherlin v. Independent School Dist. No. 40 of Nowata County, Okla.*, 960 F. Supp. 2d 1254, 1260-61 (N.D. Okla. 2013) (same).

Plaintiffs argue "Ms. Allen refusing to answer their questions explicitly to avoid jeopardizing the 'trust' between her and N.S." is sufficient for a special relationship claim

because it creates "a deeper relationship." Resp. [Doc. No. 15] at 16-17. Plaintiffs cite no authority for this proposition, and the Court finds the facts alleged are far short of "involuntary restraint by the government" required for a special relationship claim. *See Graham*, 22 F.3d at 994 (affirming dismissal of a special relationship claim because "compulsory school attendance laws do not spawn an affirmative duty to protect under the Fourteenth Amendment" and "foreseeability [of harm to a student] cannot create an affirmative duty to protect when plaintiff remains unable to allege a custodial relationship"). As such, Plaintiffs have not established a violation of their substantive due process rights under a special relationship theory, and Ms. Allen is entitled to qualified immunity on Count VI.

## V.   Conclusion

IT IS THEREFORE ORDERED that Defendants' Partial Motion to Dismiss [Doc. No. 14] is GRANTED IN PART and DENIED IN PART as fully set forth above.

IT IS SO ORDERED this 30th day of June, 2023.

SCOTT L. PALK
UNITED STATES DISTRICT JUDGE